1  Robert B. Owens, Esq. (Bar No. 77671)
2  rowens@ogrlaw.com
   OWENS & GACH RAY
3  10323 Santa Monica Blvd., Suite #102
4  Los Angeles, CA 90025
   Ph: (310) 553-6611
5  Fax: (310) 954-9191
6
7  Craig S. Hilliard, Esq.
   chilliard@stark-stark.com
8  STARK & STARK, P.C.
9  993 Lenox Drive, Bldg. Two
   Lawrenceville, NJ 08648
10 Ph: (609) 895-7346
11 Fax: (609) 895-7395
12 (PRO HAC VICE APPLICATION GRANTED)
   *Attorneys for Plaintiffs*
13 *Mon Cheri Bridals, LLC and*
14 *Maggie Sottero Designs, LLC*

15

16

17           UNITED STATES DISTRICT COURT

18           CENTRAL DISTRICT OF CALIFORNIA

19

20 | MON CHERI BRIDALS, LLC and       ) Case No. 2:18-cv-09453-MWF-AS
   | MAGGIE SOTTERO DESIGNS, LLC,     )
21 |                                  )
   |                                  ) FIRST AMENDED COMPLAINT FOR
22 |            Plaintiffs,           )   DIRECT AND CONTRIBUTORY
   |                                  )   COPYRIGHT INFRINGEMENT
23 |    vs.                           )
   |                                  )
24 |                                  )      [Demand for Jury Trial]
   | CLOUDFLARE, INC., a Delaware     )
25 | corporation; and DOES 1-500, Inclusive, )
26 |                                  )
   |            Defendants.           )
27 |                                  )
   |                                  )
28 |                                  )

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

Plaintiffs, Mon Cheri Bridals, LLC and Maggie Sottero Designs, LLC (collectively "Plaintiffs") as and for their First Amended Complaint against defendant, Cloudflare, Inc. ("Cloudflare"), and Does 1-500 inclusive, allege the following:

## JURISDICTION AND VENUE

1. This is an action seeking damages and equitable relief for direct and contributory copyright infringement. Cloudflare is an Internet service provider which is liable for the infringements committed by third-party content providers who have infringed, and are continuing to infringe, the copyrights owned by Plaintiffs in certain photographic images of dress designs. Cloudflare's liability arises from its material contribution to infringement of the infringing third party websites it provides services for by, *inter alia*, making it easier and faster for internet users to access infringing websites and content as well as knowingly making infringing content stored on its data center servers available and accessible to the consuming public after receiving credible notices of actual infringement from the copyright owners. Moreover, through its provision of Domain Name Service ("DNS"), Cloudflare allows infringing sites and their hosts to conceal their identity from copyright owners thereby preventing copyright holders from stopping the infringing sites' infringing activities. Cloudflare also fails to terminate the providing of its content delivery services to customers it knows are using those services to infringe on Plaintiffs' copyrights. Plaintiffs have filed thousands of "takedown notices" with Cloudflare, consistent with the Digital Millenium Copyright Act (DMCA), but Cloudflare has failed and/or refused to respond to those notices by terminating its services to infringers notwithstanding its actual knowledge of the infringements described therein. As such, Cloudflare is liable for the infringements committed by its customers.

2. The Court has jurisdiction over this action because it arises under the Copyright Act, 28 U.S.C. § 1338(a).

3. Venue is proper in this District because Cloudflare may be found in this District, 28 U.S.C. § 1400(a).

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

## PARTIES

4. Plaintiff, Mon Cheri Bridals, LLC ("Mon Cheri") is a Delaware limited liability company which maintains its principal place of business at 1018 Whitehead Road Ext., Trenton, New Jersey 08638.

5. Plaintiff, Maggie Sottero Designs, LLC ("Maggie Sottero") is a Utah limited liability company which maintains its principal place of business at 2300 South 1070 West, Salt Lake City, Utah 84119.

6. Cloudflare is a Delaware corporation which provides a variety of Internet services to clients, including provision of a "content delivery network" that delivers services to hosts of internet websites, including the sites described in this First Amended Complaint.

7. Plaintiffs have no knowledge of the true names and capacities of the parties sued as Doe Defendants 1-500, inclusive, and therefore sues them using fictitious names. Plaintiffs will amend their First Amended Complaint to identify these Doe Defendants specifically if and when their true names and capacities are ascertained.

8. On information and belief, through their acts or omissions, Does 1-500 are responsible, along with Cloudflare, for the injuries alleged, and therefore are liable for them.

## BACKGROUND

9. Plaintiffs are two of the largest manufacturers and wholesalers of wedding dresses and social occasion wear in the United States. Through their own creative design teams, Plaintiffs have developed many of the world's most unique and original wedding and social occasion dress patterns.

10. Plaintiffs also own the copyrights in photographic images of those dress designs. These copyrights are registered with the U.S. Copyright Office. A summary of the registrations is attached hereto as Exhibit "A".

COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT

11. The photographic images of Plaintiffs' dress designs are the lifeblood of Plaintiffs' advertising and marketing of their dress designs to the consuming public. Plaintiffs invest hundreds of thousands of dollars each year in the development of sophisticated marketing campaigns which involve the engagement of models and photographers and the coordination of expensive photoshoots to capture the appropriate "look" of the campaign for a particular line of dresses. Plaintiffs' ability to market their unique dress designs to consumers is driven largely by the copyrighted photographic images of their dresses which appear on their websites and in other marketing materials.

12. Plaintiffs, along with other members of the formalwear industry, are the victims of a massive Internet scheme to advertise and sell products using the copyrighted images of their dresses. These Internet websites, including ones serviced by Cloudflare which are the subject of this Complaint, have manufactured, imported, distributed, offered for sale and sold counterfeit goods, including bridal gowns, social occasion dresses, prom dresses and other formalwear and have sold these counterfeit goods through the use of pirated copies of Plaintiffs' photographic images, and they continue to do so to this day.

13. Counterfeiting is an illegal business that harms both consumers, who are deceived into believing they are buying genuine goods when they are actually buying counterfeits, as well as brand owners, who are deprived of sales and subject to a loss of goodwill from these low-quality fakes sold using the photographic images of genuine goods. The Internet has made it extraordinarily easy for counterfeiters to conceal that the goods they are selling are fake, hide their true identities and operate under multiple false names and addresses from extra-territorial locations in an attempt to avoid liability.

14. The quality formalwear products made by Plaintiffs have been the focus of a concerted, pervasive internet counterfeiting effort originating primarily in China, but whose effects are felt here in the United States. These counterfeit websites target consumers in the United States. Chinese merchants set up their websites to appear to be authorized retailers of genuine formalwear products, even though Plaintiffs' investigative

team has revealed that they are selling counterfeit products and that they are based primarily in China.

15. These 'rogue' websites are written in English, accept payment in US dollars and allow payment by PayPal and/or major credit cards. The merchants often perpetuate the illusion that these websites are operated by or under the authority of legitimate manufacturers by using domain names incorporating the manufacturers' trademarks and copying their original and proprietary photographic images and designs directly from their websites. These websites also use 1-800 numbers as contact information that are only accessible from the United States.

16. When the fake goods are shipped from China to the United States, they are shipped as single packages and declared as "gifts" rather than commercial shipments, and they pass through U.S. ports without paying a dime in customs duties. So while legitimate businesses in the United States pay their taxes and customs duties on imported goods, illegitimate merchants in China deceive U.S. citizens and cheat the government out of customs duties.

17. Consumers are being deceived, believing they are getting 'a good deal' on genuine products rather than buying counterfeit goods. Plaintiffs and other companies in the formalwear industry have received numerous complaints from consumers who reported purchasing what they believed were genuine dresses on these types of authentic-looking websites, only to receive counterfeit dresses of vastly inferior quality. While the China-based websites all claim to be selling genuine products, nothing could be further from the truth. Plaintiffs have purchased a number of dresses from these websites, and each one received to date has been identified as counterfeit.

18. Counterfeiters are notoriously difficult to stop. Even when a brand owner challenges the sale of counterfeit goods by requesting that a particular Internet service provider remove or suspend an infringing website, the counterfeiter loses no inventory,

COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT

retains all of its profits and simply moves that portion of its business to another website, or moves the website to another web host or registrar.  It is so simple and inexpensive for a counterfeiter to set up a new domain and move its illegal business to a new site, that conventional efforts to address the problem are ineffectual.

19. Plaintiffs are also members of the American Bridal & Prom Industry Association, Inc. ("ABPIA").  ABPIA is a not for profit corporation organized under New Jersey law.  ABPIA is organized exclusively as a business league or trade association for the formalwear industry within the meaning of Section 501(c)(6) of the Internal Revenue Code of 1986.  The purposes of ABPIA are as follows:

- to take any and all appropriate and lawful action against the marketing and sale of counterfeit formalwear products;

- to educate consumers, retailers and members of the formal industry and the general public about the harm to consumers and fair competition in the formalwear industry caused by the marketing and sale of counterfeit products;

- to lobby governmental entities to aid the formalwear industry in the fight against the marketing and sale of counterfeit products; and to conduct discussions among members of the formalwear industry in the fight against the marketing and sale of counterfeit products.

20. In the last five years, ABPIA has successfully prosecuted claims against hundreds of websites who display illegal copies of photographic images owned by Plaintiffs and others to woo unsuspecting consumers into purchasing knockoff goods.  ABPIA has secured default judgments and permanent injunctive relief in the following actions, which relief included the disabling of over 1,500 websites: *American Bridal & Prom Industry Association v. Moncherybridal.com et al,* Civil Action No. 12-7079 (FLW)(LHG), *American Bridal & Prom Industry Association v. Affordablebridaldress.com et al,* Civil Action No. 14-2311 (AET)(LHG), *American Bridal & Prom Industry Association v. Weddingshoparizona.com et al,* Civil Action No. 13-4081 (FLW)(LHG),

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

*American Bridal & Prom Industry Association v. Chiffondressstore.com et al,* Civil Action No. 13-4347 (FLW)(LHG), *American Bridal & Prom Industry Association v. Weddingshopevansville.com et al,* Civil Action No. 13-5544 (FLW)(LHG), *American Bridal & Prom Industry Association v. Loversbridal.com et al,* Civil Action No. 14-1570 (FLW)(LHG), *American Bridal & Prom Industry Association v. 2016dressforprom.com et al,* Civil Action No. 16-8272 (AET)(LHG), *American Bridal & Prom Industry Association v. Jollyprom.com et al,* Civil Action No. 17-2454 (AET)(LHG).

21. As described below, Cloudflare materially contributes to, and thereby enables, the successful efforts of these counterfeit websites to deceive the consuming public and violate the copyrights of Plaintiffs and other members of the formalwear industry.

**Cloudflare**

22. Cloudflare, according to www.cloudflare.com, is a "web performance and security company." Cloudflare says it offers: (1) a content delivery network ("CDN"); (2) web content optimization; (3) website security; (4) DDoS (denial of service) protection; and (5) a managed domain name system (DNS) network.

23. Cloudflare further states on its website: "Once your website is a part of the Cloudflare community, its web traffic is routed through our intelligent global network. We automatically optimize the delivery of your web pages so your visitors get the fastest page load times and best performance. We also block threats and limit abusive bots and crawlers from wasting your bandwidth and server resources. The result: Cloudflare-powered websites see a significant improvement in performance and a decrease in spam and other attacks."

24. Cloudflare's Terms of Service provides that it retains the right to investigate its customers, their sites and "the materials comprising the sites" at any time. The Terms further provide that any violation of law will justify termination of CloudFlare's services. "CloudFlare's policy is to investigate violations of these Terms of Service and terminate repeat infringers."

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

25.     Cloudflare's CDN is a service offered to website hosts and operators. The service is designed to speed a consumer's access to the website of Cloudflare's client through a series of data centers maintained by Cloudflare that cache mirror copies of that site. In this manner, consumers seeking to access the website of a Cloudflare client can retrieve the site from the closest Cloudflare data center rather than accessing the site from the primary host. Cloudflare boasts that it maintains dozens of data centers around the world that automatically cache static files of its clients so those files are stored closer to the visitors of the client's website, while still delivering dynamic content directly from the client's web server. Cloudflare then uses a technology called Anycast to route visitors to the nearest data center. The result is that a website, on average, loads twice as fast for visitors regardless of where they are located.

26.     Cloudflare's service allows counterfeit sites and their hosts to conceal their identity from copyright owners. Cloudflare provides a so-called "pass-through security service" that acts, in effect, as a "middleman" that sits between a website and the users who interact with it. Rather than allow users to contact the server on which the website is hosted directly, Cloudflare receives certain user interactions with their client websites and relays them through Cloudflare servers to the hosting provider. Because of the presence of Cloudflare's servers, it is impossible to identify the location of the actual server supporting those aspects of the website absent the disclosure of this information by Cloudflare. When presented with a notice of infringement, Cloudflare asserts that it is itself unable or unwilling to remove any infringing content, and that the copyright owner must contact its customer to seek removal of the infringing content. In this fashion, Cloudflare shields pirate sites and their hosts from legal recourse by copyright owners.

27.     Despite Cloudflare's attempts to distance itself from any meaningful control over the infringing content that resides on its customers' websites, Cloudflare's own website boasts the following:

   a.   "Cloudflare caches your content across our global network, bringing it closer to visitors from every region." https://www.cloudflare.com/cdn/

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

      b.    "A content delivery network (CDN) takes your static content and *stores a copy* closer to your visitors." https://www.cloudflare.com/website-optimization/

      c.    Cloudflare's Service "is offered primarily as a platform to cache and serve web pages and websites." https://cloudflare.com/terms/

28. Moreover, Cloudflare expressly reserves the right to modify its clients' websites. Cloudflare's Terms of Service give it the right to "modify certain components" of a client's website, including the addition of scripts, cookies and other changes to enhance performance.

29. Cloudflare touts the ease with which its clients can use its services, by telling prospective customers that "Setting Up Cloudflare is Easy," and it even offers a video showing how a webmaster can place its site on the Cloudflare domain server with a few points and clicks. https://cloudflare.com/. "Set up a domain in less than 5 minutes. Keep your hosting provider. No code changes required." *Id.* "Cloudflare makes more than 10,000,000 Internet properties faster and safer. Join today!" *Id.*

30. Cloudflare further tells its clients that "[e]veryone's Internet application can benefit from using Cloudflare. Pick a plan that fits your needs." https://www.cloudflare.com/plans/ Cloudflare has a teaser "free" plan "[f]or personal websites." *Id.* Cloudflare touts a "Pro" plan, $20 per month per domain, for "professional websites," and a "Business" plan, $200 per month per domain, for "small eCommerce websites and businesses requiring advanced security and performance…" *Id.*

31. Numerous infringing websites, including but not limited to cabridals.com, bidbel.com, stydress.com, angelemall.co.nz, jollyfeel.com, russjoan.com, missydress.com.au, and livedressy.com, are Cloudflare clients and utilize Cloudflare's services. As described herein, Cloudflare has actual knowledge that these websites are making unauthorized use of Plaintiffs' copyrighted photographs, and yet continues

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

materially to contribute to these websites' ongoing infringement of Plaintiffs' copyrighted images by providing the aforesaid services to those websites in the face of such knowledge.

32. Plaintiffs' authorized agent for infringement notifications, XML Shop LLC d/b/a Counterfeit Technology, scours the internet with special bots designed to locate and identify the unauthorized use, reproduction, and display of Plaintiffs' copyrighted images.

33. In fact, Counterfeit Technology has identified more than 365 website clients of Cloudflare that contain, display, and use infringing and unauthorized copies of Plaintiffs' copyrighted photographs with the material assistance of Cloudflare's suite of services. A list of infringing websites (the "Infringing Websites") and the number of takedown notices submitted by Counterfeit Technology to Cloudflare for each website is attached hereto as Exhibit "B".

34. After identifying infringing content on an unauthorized website, Counterfeit Technology has sent numerous takedown notices to Cloudflare, alerting Cloudflare of the existence and location of Plaintiffs' copyrighted photographs on pirate sites that infringe upon Plaintiffs' copyrights. A sample of those notices is attached hereto as Exhibit "C".

35. Through Counterfeit Technology, Plaintiffs have sent thousands of such takedown notices to Cloudflare, which oftentimes include second, third, and fourth notices regarding the same infringing sites. A spreadsheet identifying the dates Counterfeit Technology sent these takedown notices to Cloudflare is attached hereto as Exhibit "D".

36. Cloudflare has ignored these notices and takes no action after being notified of infringing content on its clients' websites.

37. Attached as Exhibit "E" is an initial list of the photographic images (by URL) to which Plaintiffs hold exclusive rights under copyright, and which have been infringed by Cloudflare website clients with Cloudflare's continuing, material assistance and knowledge. As set forth in Exhibit "A", the copyrights in each of these works are registered with the U.S. Copyright Office. Plaintiffs intend to amend their Complaint at an appropriate time to provide an expanded list of works infringed by Defendants.

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

38. By continuing to provide its CDN and other services to the Infringing Websites even after receiving repeated notices of the infringing activity by those websites, Cloudflare materially contributes to infringing conduct on a massive scale and does so with actual knowledge of the infringing conduct. Specifically, even after learning of specific, identified acts of copyright infringement by the Infringing Websites through Plaintiffs' takedown notices, Cloudflare continues to cache, mirror, and store a copy of the Infringing Websites and the infringing content on its data center servers, and to transmit upon request copies of the infringing content to visitors of the Infringing Websites. Cloudflare's contributions allow the internet browsers of visitors to the Infringing Websites to access and load the Infringing Websites and content much faster than if the user was forced to access the Infringing Websites and content from the primary host absent Cloudflare's services.

39. As a result of Cloudflare's services and network, internet users have quicker, faster access to infringing content stored on Cloudflare's servers even though that content belongs to a third party client of Cloudflare.

40. By knowingly continuing to host and transmit content stored on its network of data centers that infringes Plaintiffs' copyrighted works, and by continuing to allow internet users to access, view, and interact with such content, Cloudflare materially contributes to the copyright infringement of its website clients, including the unauthorized display and reproduction of Plaintiffs' copyrighted images.

41. Cloudflare is able to take simple measures to prevent the infringement of Plaintiffs' copyrighted images and works by and through the revocation and termination of its services to infringing clients, yet intentionally chooses not to in order to not lose the monthly subscriptions paid by those infringing clients. Termination of Cloudflare's services to infringing websites would prevent further damages because absent Cloudflare's contributions, it would take users twice as long to access and load the infringing images, making the websites less desirable and decreasing the likelihood that users purchase goods from the infringing sites. In today's digital age, internet users who encounter a slow,

unstable website quickly become disinterested and will likely not engage with the website opting instead to seek out alternative, faster loading sites.

42. In this regard, with knowledge of the infringement, Cloudflare facilitates access to its clients' infringing websites, significantly magnifies the effects of its clients' infringing activities, and provides direct infringers with server space, thereby subjecting Cloudflare to liability for contributory infringement by and through its continued offering of CDN and related services to infringing websites and continuing to store cache copies of infringing content on its servers after being notified of its website clients' infringing activity.

43. With knowledge of the infringement, Cloudflare provides customers with a faster, safer, and more efficient means by which they can deliver their infringing content to United States consumers. In fact, many times Cloudflare's servers maintain the only copies of the infringing content in the United States since many of the Infringing Websites are hosted in China and other extraterritorial countries known for prolific counterfeiting.

44. Cloudflare is able, but fails to take simple measures to stop or reduce the repeated infringement of which it is aware and to which it is a contributor.

45. In this fashion, Cloudflare substantially assists primary infringement and has induced, materially contributed to, profited from, and aided and abetted multiple infringements of Plaintiffs' copyrights, failing and refusing all along to implement or enforce a repeat infringer policy, and is thus liable for the infringements alleged herein.

## FIRST CLAIM FOR RELIEF – AGAINST DOES 1-500
## DIRECT COPYRIGHT INFRINGEMENT

46. Plaintiffs repeat and incorporate the prior allegations in this Complaint as if repeated verbatim herein.

47. As detailed above, the Infringing Websites are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights in their copyrighted images by displaying those images on their websites and transmitting copies of those images to visitors of their websites.

48. The Infringing Websites' unauthorized use of Plaintiffs' copyrighted images in this manner violates the Plaintiffs' exclusive rights to display and reproduce those images under 17 U.S.C. §§ 106(1) and 106(5).

49. As a result of these Defendants' acts of infringement, Plaintiffs are entitled to injunctive relief, damages, disgorgement of profits, statutory damages and attorneys' fees.

## SECOND CLAIM FOR RELIEF – AGAINST CLOUDFLARE, INC. CONTRIBUTORY COPYRIGHT INFRINGEMENT

50. Plaintiffs repeat and incorporate the prior allegations in this Complaint as if repeated verbatim herein.

51. As detailed above, the Infringing Websites are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights to display and reproduce their copyrighted images.

52. Cloudflare is liable as a contributory copyright infringer for this infringing activity. Cloudflare has actual knowledge of specific, identified acts of infringement by the Infringing Websites from Plaintiffs' takedown notices. In addition, Plaintiffs' repeated notices alerting Cloudflare to the infringing nature of particular websites to whom Cloudflare offers its services has provided Cloudflare with actual knowledge, or at minimum willful blindness, that those particular sites are repeat infringers and that further activities by those Infringing Websites – including the use of further of Plaintiffs' images – is not authorized by the copyright owners.

53. Despite such actual and imputed knowledge, Cloudflare knowingly and intentionally continues to contribute materially to infringing activity by its clients, including but not limited to the infringement of the specific works identified in this Complaint, by continuing to provide services that facilitate the Infringing Websites' display and reproduction of Plaintiffs' copyrighted images.

54. As a result of Cloudflare's acts of infringement, Plaintiffs are entitled to injunctive relief, damages, disgorgement of profits, statutory damages and attorneys' fees.

# PRAYER

55. Plaintiffs pray for entry of judgment including the following relief:

    a. Actual damages in a sum to be proven at time of trial, in no event less than $1,000,000;

    b. Statutory damages under the Copyright Act;

    c. Disgorgement of Defendants' profits from their infringing activities;

    d. Costs and attorneys' fees under the Copyright Act;

    e. Preliminary and permanent injunctive relief; and

    f. Such other and further relief as the Court deems appropriate.

Dated: February 6, 2019

                      OWENS & GACH RAY

                      By /s/ *Robert B. Owens*
                      Robert B. Owens, Esq.
                      Attorneys for Plaintiffs

**COMPLAINT FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT**