Robert B. Owens, Esq. (Bar No. 77671)
rowens@ogrlaw.com
**OWENS & GACH RAY**
10323 Santa Monica Blvd., Suite #102
Los Angeles, CA 90025
Ph: (310) 553-6611
Fax: (310) 954-9191

Craig S. Hilliard, Esq.
chilliard@stark-stark.com
Gene Markin, Esq.
gmarkin@stark-stark.com
**STARK & STARK, P.C.**
993 Lenox Drive, Bldg. Two
Lawrenceville, NJ 08648
Ph: (609) 895-7248
Fax: (609) 895-7395
(*Pro Hac Vice* Applications Granted)

*Attorneys for Plaintiffs*
*Mon Cheri Bridals, LLC and*
*Maggie Sottero Designs, LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# (SAN FRANCISCO DIVISION)

| | |
|---|---|
| **MON CHERI BRIDALS, LLC** and MAGGIE SOTTERO DESIGNS, LLC, | Case No. 19-CV-01356-VC |
| Plaintiffs**,** | |
| **vs.** | **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **CLOUDFLARE, INC**., a Delaware corporation; and DOES 1-10, Inclusive, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................iii

Citation Guide .......................................................................................................... iv

Preliminary Statement ...............................................................................................1

Statement of Undisputed Facts .................................................................................3

Legal Argument ......................................................................................................16

    I.     Summary Judgment Standard..................................................................16

    II.    Plaintiffs Are Entitled To Summary Judgment On Their Direct
          Copyright Infringement Claims .................................................................17

    III.   Plaintiffs Are Entitled To Summary Judgment On Their
          Contributory Infringement Claims .........................................................18

    Conclusion.................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) .............................................. 19, 20, 22

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ................................................... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................... 16, 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................. 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ...................................... 17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ........................................ 17

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ..................................... 23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098 (N.D. Cal. 2008) ................... 20

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936 (9th Cir. 2011) .................................. 23

*Luvdarts, Ltd. Liab. Co. v. AT&T Mobility, Ltd. Liab. Co.*, 710 F.3d 1068 (9th Cir. 2013) .............. 19, 21

*Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998) ......................................... 18

*Miller v. Facebook, Inc., No. C 10-00264 WHA*, 2010 U.S. Dist. LEXIS 31534 (N.D. Cal. Mar. 31, 2010)  20

*Netcom*, 907 F. Supp. ............................................................... 20, 22-23

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....................................... 19, 20, 22

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002) .............................. 17

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) ........................................ 18

*Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788 (9th Cir. 2007) ..................................... 18

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007) ..................................... 16

*Umg Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743 (W.D. Tex. 2019)  20, 21

*Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017) .................................... 17

*Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d 110 (S.D.N.Y. 2013) ................................. 19

## Statutes

17 U.S.C. §512(c)(3)(A)(iii) ................................................................. 19

17 U.S.C. § 106(1)-(3).  To ................................................................. 17

17 U.S.C. § 410(c) ......................................................................... 18

17 U.S.C. § 501 ........................................................................... 17

17 U.S.C. § 501(a) ........................................................................ 17

## Rules

Fed. R. Civ. P. 56(c) ...................................................................... 16

Rule 56 ................................................................................... 16

4850-0323-7356, v. 1

# CITATION GUIDE

## Declarations

- "**Markin Decl**." refers to the Declaration of Gene Markin, Esq.
- "**Ter-Saakov Decl**." refers to the Declaration of Suren Ter-Saakov.
- "**Liney Decl**." refers to the Declaration of Jon Liney.
- "**Taylor Decl**." refers to the Declaration of Hilary Taylor.

## Depositions

- "**Ter-Saakov Dep 1**" refers to Deposition Transcript of Suren Ter-Saakov dated March 16, 2021.
- "**Ter-Saakov Dep 2**" refers to Deposition Transcript of Suren Ter-Saakov dated March 17, 2021.
- "**Ter-Saakov Dep 3**" refers to Deposition Transcript of Suren Ter-Saakov dated March 18, 2021.
- "**Ter-Saakov Dep 4**" refers to Deposition Transcript of Suren Ter-Saakov dated April 21, 2021.
- "**Lang Dep 1**" refers to the Deposition Transcript of Stephen Lang dated March 26, 2021.
- "**Lang Dep 2**" refers to the Deposition Transcript of Stephen Lang dated April 6, 2021.
- "**Liney Dep 1**" refers to the Deposition Transcript of Jonathan Liney dated April 9, 2021.
- "**Liney Dep 2**" refers to the Deposition Transcript of Jonathan Liney dated April 10, 2021.
- "**Redford Dep 1**" refers to the Deposition Transcript of Clyde Redford dated April 7, 2021.
- "**Redford Dep 2**" refers to the Deposition Transcript of Clyde Redford dated April 20, 2021.
- "**Taylor Dep**" refers to Deposition Transcript of Hilary Taylor dated April 12, 2021.
- "**Guinn Dep 1**" refers to Deposition Transcript of Albert (Trey) Guinn III dated April 8, 2021.
- "**Guinn Dep 2**" refers to Deposition Transcript of Albert (Trey) Guinn III dated May 7, 2021.
- "**Paine Dep 1**" refers to Deposition Transcript of Justin Paine dated April 1, 2021.
- "**Paine Dep 2**" refers to Deposition Transcript of Justin Paine dated April 19, 2021.

## Other References

- "**Exh**." refers to an Exhibit attached to the Markin Decl. unless otherwise noted.
- "**FAC**" refers to Plaintiffs' First Amended Complaint.
- "**No.**" refers to the request number.
- "**Nos.**" refers to the request numbers.
- "**Jonyer Report**" refers to the Expert Report of Istvan Jonyer, Ph.D dated June 17, 2020.
- "**2nd RFA Resp**." refers to Cloudflare's Responses and Objections to Plaintiffs' Second Set of Requests for Admission.
- "**3rd RFA Resp**." refers to Cloudflare's Responses and Objections to Plaintiffs' Third Set of Requests for Admission.
- "**4th RFA Supp. Resp**." refers to Cloudflare's Supplemental Responses and Objections to Plaintiffs' Fourth Set of Requests for Admission.
- "**PSF**" refers to Plaintiffs' Statement of Undisputed Facts in support of motion for summary judgment.

4850-0323-7356, v. 1

## PRELIMINARY STATEMENT

Defendant Cloudflare, Inc. ("Cloudflare") provides website security, optimization, and performance services to website clients across the globe.  Cloudflare's standard free service plan includes caching, reverse-proxy, and DNS services, which have the combined effect of making Cloudflare the gatekeeper of all normal web traffic flowing to and from its clients' websites.  Sitting between the end user consumer and the website hosting provider, Cloudflare's network inspects, directs, and optimizes web traffic consisting of end user requests for Cloudflare client website content, the transmission of data from the host server to the end user, and delivery of website content from cache in response to user requests.  By inspecting, regulating, and manipulating traffic throughout its network, Cloudflare can detect and thwart malicious attacks on client websites as well as speed up delivery of website content, including generally slow-loading images and pictures.

 While many legitimate websites use Cloudflare's services (including one of the Plaintiffs), some bad actors, primarily those located in China, use Cloudflare's services to lure e-commerce consumers within the United States to purchase knock-off, counterfeit goods using stolen images of authentic products.  With Cloudflare's help, these counterfeiters reach consumers faster, safer, and stealthier.  Owners of these websites hide their identity and that of their (usually foreign) hosting provider behind Cloudflare's reverse-proxy and rely on Cloudflare's caching and website optimization services to quickly and reliably advertise "unbeatably priced dresses" using Plaintiffs' hard-earned images.

Plaintiffs Mon Cheri Bridals, LLC ("Mon Cheri") and Maggie Sottero Designs, LLC ("Maggie Sottero") are world-renowned dress manufacturers selling premium wedding, social occasion, and women's formal wear dresses to authorized retailers for re-sale to the consuming public.  Using carefully crafted and meticulously staged images of their dresses and dress design collections, Plaintiffs promote and market their respective brands to consumers and retailers through online catalogues.  Plaintiffs spend millions of dollars every year on photoshoots and post-production editing to develop stunning images of their dress collections, which are the lifeblood of Plaintiffs' brands, reputation, and identity.  The

professional images, which encompass and espouse Plaintiffs' respective brand ethos, are the means by which Plaintiffs attract customers to consider their dresses and drive traffic to retailers. In Plaintiffs' competitive industry, images are everything and directly impact consumer interest and purchase decisions.

It is therefore extremely disheartening when counterfeiters steal Plaintiffs' images and use them on their e-commerce websites to sell cheap knockoffs at a fraction of the price of the dresses in the photographs. Unwary consumers looking for the "best deal" fall into the trap thinking they are ordering the beautiful dress in the picture only to be disappointed when they receive a garment that looks, feels, and fits nothing like it.

After discovering a Cloudflare client website using their images without permission, Plaintiffs sent Cloudflare notices alerting Cloudflare to the specific infringement by identifying the original copyrighted image and the infringing image URL as well as requesting Cloudflare take action to prevent further infringement of Plaintiffs' works. Despite having a repeat infringer policy, which focused solely on subpoenas, court orders, and court adjudications, Cloudflare took no action in response to Plaintiffs' infringement complaints except to provide Plaintiffs with the website hosting provider's information and to forward a copy of the complaint to its customer and the website's hosting provider.

Notably, Cloudflare *did not* investigate the alleged infringement, *did not* request any information from its customers, *did not* remind its customers of Cloudflare's infringement policy or threaten any type of disciplinary action, *did not* ask its customer to take any meaningful action, *did not* remove the allegedly infringing image from its cache, and *did not* do anything to evaluate whether its customer was indeed engaged in infringing activities. It did not matter whether Cloudflare received 1, 101, 10,000, or 1,000,000 infringement notices concerning a domain client – its response and handling of the complaints was always the same.

Yet, after receiving numerous notices of infringement implicating a website client, Cloudflare could have taken simple measures to prevent further infringement, including *evicting the infringing*

*content* from its cache servers and *terminating caching services* until the website proves compliance with Cloudflare's anti-infringement policies, *blocking traffic* traveling through Cloudflare's network from reaching or accessing the infringing content, and *reconfiguring its firewall settings* so that users trying to access the infringing domain would be redirected to a blank page.  And while Cloudflare may not have control over the infringing content on a website's origin host servers, it can and should do its part to curb infringement by not permitting repeat infringers to use its services to more effectively and quickly distribute infringing material to consumers in the United States.

Consequently, Cloudflare materially contributed to its clients' repeat infringement of Plaintiffs' copyrighted works and is therefore liable for contributory copyright infringement.

## STATEMENT OF UNDISPUTED FACTS

**About Plaintiffs & Their Works**

1.     Plaintiffs Mon Cheri Bridals, LLC ("Mon Cheri") and Maggie Sottero Designs, LLC ("Maggie Sottero") are renowned designers and manufacturers of various lines and collections of wedding dresses and women's social occasion apparel.  FAC, Exh. B, ¶ 9; Lang Dep 1 (Exh. C) at 10:23 to 11:16; Redford Dep 1 (Exh. G) at 48:6-21.

2.     Plaintiffs sell their dresses directly to authorized retailers who re-sell the dresses to the general consuming public.  Lang Dep 1 at 43:15-24; Liney Dep 1 (Exh. E) at 24:10-17.

3.     Plaintiffs invest considerable amount of resources, time, and money into staging photoshoots, selecting models, locations, and designs, post-production editing, and selecting the "right" photographs to use each season.  Lang Dep 1 at 45:13 to 46:14; Liney Dep 1 at 59:19 to 61:22; Redford Dep 1 at 59:23 to 63:5.

4.     Even though Plaintiffs do not sell or license their images, they heavily rely on the images to promote their brands and market their dresses to retailers and end consumers.  Lang Dep 2 at 263:11-22, 264:1-21; Redford Dep 1 at 75:8 to 76:19.

3

5.      Plaintiffs primarily publish their images on their respective websites and make them available to authorized retailers who use them for marketing and advertising purposes.  Lang Dep 1 at 47:19 to 48:20; Lang Dep 2 at 290:20 to 291:1; Liney Dep 1 at 84:1-15; Taylor Dep at 51:6 to 52:25.

6.      Around the time the images are published online, Plaintiffs file for and obtain copyright registrations for the images they use.  Liney Dep 1 at 60:14 to 61:12; Liney Dep 2 (Exh. F) at 203:13-19; Taylor Dep at 27:5-7, 47:13 to 50:16, 84:23 to 85:18.

7.      Plaintiffs are the owners of the images at issue in this case and have obtained valid copyright registrations for them.  Lang Dep 1 at 36:8-19; Liney Dep 1 at 80:9-16, 82:1-9, 86:2-12, 86:21 to 89:15, 90:21 to 91:25; Redford Dep 2 at 145:23-25, 189:24 to 190:7; Taylor Dep at 53:18 to 59:7, 67:1-14, 84:23 to 85:18; Taylor Decl., ¶¶ 3-6; Liney Decl., ¶¶ 3-6.

**Infringement of Plaintiffs' Works**

8.      Unfortunately, pirate websites steal Plaintiffs' images and use them on e-commerce websites to sell knock-off, counterfeit dresses.  FAC, ¶ 12; Liney Dep 1 at 61:7-18; Liney Dep 2 at 184:10-18.

9.      Consumers who are duped into ordering dresses from counterfeit websites based on pirated images of Plaintiffs' dresses end up receiving inferior products and then attribute the inacceptable quality to Plaintiffs.  Liney Dep 2 at 126:14 to 127:1, 146:17 to 147:18, 160:11-22, 186:22 to 187:6; Redford Dep 1 at 32:9 to 33:6, 101:25 to 105:10.

10.      Counterfeiters typically lure consumers by displaying Plaintiffs' high-quality images of premium designer dresses advertised at very low, "unbeatable" prices (usually less than $800 to be under custom's duty-free threshold), which are a small fraction of the actual retail price of the authentic dresses featured in the images.  Liney Dep 2 at 212:17 to 213:12; Redford Dep 1 at 91:8-18.

**Plaintiffs' Battle Against Infringement & Counterfeiting**

11.     Mon Cheri engaged XMLShop, LLC d/b/a Counterfeit Technology ("Counterfeit Technology") by and through a trade organization American Bridal & Prom Industry Association ("ABPIA") sometime in 2015 to serve as Mon Cheri's authorized agent for purposes of identifying infringement of Mon Cheri's copyrighted images on the Internet as well as in submitting infringement and take-down notices to third parties concerning the discovered infringement.  Lang Dep 1 at 22:6 to 28:2, 109:9-15; Lang Dep 2 at 283:11-14, 296:11-19; Liney Dep 1 at 68:4 to 69:4; Software License Agreement between XML Shop and ABPIA dated October 15, 2014, Exh. U.

12.     After Maggie Sottero joined ABPIA, it also started using Counterfeit Technology's services.  Plaintiffs gave Counterfeit Technology limited Power of Attorney to investigate infringements of their copyrighted images and to submit DMCA and other copyright infringement notifications to hosting providers, search engines, and Internet Service Providers such as Cloudflare.  Redford Dep 1 at 29:4-21, 115:11-17; Taylor Dep at 74:17 to 76:4; Liney Dep 1 at 98:12 to 99:24; Ter-Saakov Dep 1 (Exh. J) at 77:21 to 78:8, 83:20 to 84:5; Ter-Saakov Dep 2 (Exh. K) at 144:20 to 145:3; Powers-of-Attorney from Mon Cheri and Maggie Sottero, Exh. II.

13.     Counterfeit Technology used a proprietary technology with proven accuracy identifying copies of images on the web to scour the Internet to identify potential infringements of original images.  Liney Dep1 at 100:11 to 101:8; Liney Dep 2 at 215:20 to 219:1; Ter-Saakov Dep 1, (Exh. J) at 106:16 to 109:4.

14.     Generally, infringing websites will start using Plaintiffs' images within a few days or weeks after the images are published on Plaintiffs' respective websites.  Lang Dep 1 at 115:1-7; Liney Dep 1 at 66:23 to 67:14.

15.     Infringing websites use Plaintiffs' images to attract and induce unsuspecting consumers into purchasing knock-off, low quality dresses.  Lang Dep 1 at 156:24 to 157:2; Liney Dep 2 at 144:12-20, 158:24 to 160:10; Redford Dep 1 at 30:8 to 31:19; Redford Dep 2 at 248:21 to 249:15.

5

16.     Plaintiffs have discovered and collected proof that the domains at issue here, owned and operated by the Doe Defendants, have used Plaintiffs' copyrighted images without authorization to market and sell knockoff dresses.  Ter-Saakov Decl., ¶¶ 3-14; Documentation of Repeat Infringement, Exhibit C to the Ter-Saakov Decl.

**About Cloudflare & Cloudflare's Website Optimization Services**

17.     Cloudflare offers customers improved website speed and performance through its Content Delivery Network (CDN), which "is a geographically distributed group of servers that ensure fast delivery of internet content including HTML pages, JavaScript files, stylesheets, and *images*."  Cloudflare Support Article "Understanding Cloudflare's CDN," Exh. V, p. 2 ("Overview") (emphasis added).

18.     According to Cloudflare:

> [a] primary benefit of a CDN is its ability to deliver content *quickly and efficiently*.
> …
> By reducing the total distance all the necessary traffic needs to traverse, each user to the website is saving an amount of load time.  *Because users start to leave the site (bounce) very quickly as wait times increase, this improvement represents both a better user experience and higher user time on page*.
> …
> In order to improve page load times, CDNs reduce overall data transfer amounts between the CDN's cache servers and the client.  Both the latency and the required bandwidth are reduced when the overall amount of data transferred goes down.  The result is *faster page loads* and lower bandwidth costs.
>
> ["CDN Performance" by Cloudflare, Exh. W, pp. 1, 6, 9 (emphasis added).]

19.     Cloudflare's CDN service includes caching (temporarily storing) customers' website content, including images, on servers closer to end users "to speed up delivery of content to end users." *See* 2nd RFA Rep., Exh. X, No. 14.

20.     Under Cloudflare's Free plan, users receive security protection, CDN and caching services as well as benefits that improve website performance and speed up delivery of content.  Guinn Dep 1 (Exh. O) at 40:17 to 42:18, 93:17 to 96:12.

6

21.     The Free plan also includes website optimization services, including auto minification and Brotli; Cloudflare's paid plans build on those services and include additional website performance enhancing tools such as Polish and Enhanced HTTP2 prioritization.   These tools improve website efficiency and increase website load speed, including the speed it takes larger files such as images to load. Guinn Dep 2 (Exh. P) at 142:12 to 147:8.

22.     All else being equal, a website that uses Cloudflare's CDN and caching services will load faster than a website that does not.  Paine Dep 1 (Exh. N) at 178:19 to 179:3; Guinn Dep 1 at 45:20 to 46:8 (one of the benefits of cache is to cause cached content to load faster); Guinn Dep 2 at 173:24 to 174:3 ("Definitely one of the purposes of a CDN is to – to deliver content quickly.").

23.     Cloudflare automatically caches image files, including file extension types jpeg, jpg, gif, and tif, unless directed not to by the website client's hosting provider or by the website client through Page Rule settings on the Cloudflare account dashboard.   Cloudflare Support Article "Customizing Cloudflare's Cache," Exh. Y, p. 2 ("Overview"); Cloudflare Support Article "Understanding Cloudflare's CDN," Exh. V at pp. 4-5 ("Understand file extensions cached by default"); Guinn Dep 2 at 153:14 to 154:14.

24.     There is no evidence that any of the website customers at issue in this case disabled Cloudflare's caching services at the time any of the alleged infringements occurred.

25.     The overwhelming majority of the infringing images used by the counterfeit websites at issue here were .JPG files, which Cloudflare caches by default.  Ter-Saakov Decl., ¶ 16; Documentation of Repeat Infringement (Exhibit C to the Ter-Saakov Decl.).

26.     By storing content on its cache servers all over the United States, Cloudflare delivers content more quickly than if the content is pulled from the host server, which could be many thousand miles away.  Paine Dep 1 at 218:15 to 221:11.

27.     Images tend be larger file types, and therefore, by delivering website images from cache, Cloudflare can significantly improve the speed of delivery and the time it takes a website to load.  Paine Dep 1 at 228:24 to 230:12.

28.     Cloudflare keeps static content in its cache for up to the Time To Live ("TTL") setting, which is at least 2-hours for Free plan users, and if the content is not evicted from cache sooner due to storage constraints, at the end of the TTL period, Cloudflare will check the origin host server to see if the cached content was removed or changed, and if it was modified on the host server, Cloudflare will refresh its cache with a copy of the modified, updated content, or if unchanged, it will refresh the original content. Paine Dep 1 at 208:3 to 225:7; "Cache Rules Everything Around Me" Article by Cloudflare, Exh. Z, p. 1 ("Edge cache expire TTL is the setting that controls how long CloudFlare's edge server will cache a resource before requesting a fresh copy from your server."); Guinn Dep 2 at 246:15-23.

29.     One request from a user for a website containing cacheable content may be enough for Cloudflare to store the requested content in cache – and once stored, the content could remain there for hours as it continues to be served to users and web browsers.  Guinn Dep 1 at 61:14 to 63:20, 72:12-25.

30.     And even when cached content gets deleted from the origin host server, Cloudflare will continue to serve that content from cache for hours until the TTL expiration if users continue requesting it.  Guinn Dep 1 at 85:3-16; Ter-Saakov Dep 4 (Exh. M) at 468:13 to 476:11.

31.     Cloudflare also provides reverse-proxy services under all plan types whereby Cloudflare acts as the middle man for all traffic flowing to a customer's website: when a user requests a Cloudflare client website, the connection request goes through Cloudflare's network to the hosting provider, and then information from the hosting provider is transmitted back to the user through Cloudflare's network.  Paine Dep 1 at 195:13 to 197:4; Paine Dep 2 at 22:14 to 23:3; Guinn Dep 2 at 152:5-11.

32.     As a result, a website client's domain resolves to Cloudflare's IP addresses, and therefore, copyright owners looking to submit an infringement complaint to the website or the website's host will

typically contact Cloudflare – and Cloudflare expects to receive such reports concerning the subset of clients who are accused of infringement.  Paine Dep 2 at 29:13 to 32:7, 36:9-23; Ter-Saakov Decl., ¶ 15.

33.     Unless an Internet user knows the IP address of a website or has the contact information of the website owner, the only way that user can access a Cloudflare client website is through Cloudflare – and if Cloudflare is unable to deliver the content through its network for some reason, the user will have no way to access the website.  Guinn Dep 1 at 49:15-20; Guinn Dep 2 at 211:1 to 230:11.

34.     Cloudflare also provides DNS services, boasts it delivers "the fastest DNS performance," and "requires users to change their DNS when signing up for Cloudflare."  Fast & Secure Managed DNS Services by Cloudflare, Exh. AA, pp. 3, 5; Guinn Dep 2 at 152:12-15 ("Under [the Free and Pro plans] customers are required to name Cloudflare's nameserver as the authoritative controlling nameserver.").

35.     Faster DNS performance means website content can start loading quicker.  Guinn Dep 2 at 184:1 to 185:2.

36.     While users have the ability to customize and change their account settings, the most common setting is to name Cloudflare's nameservers as the authoritative nameserver for the customer's website, which means any Internet user or browser who does not know the IP address of the customer's website and attempts to access the website will be served the website by and through Cloudflare's network.  In other words, the only way Internet users can access a Cloudflare customer website is through Cloudflare.  Paine Dep 1 at 197:15 to 201:10; Guinn Dep 1 at 96:18 to 101:3, 104:9-17; Jonyer Report, Exh. EE, pp. 12-27; 4th RFA Supp. Resp, Exh. II, No. 68 [67] (admitting Cloudflare required many of the Repeat Infringer Domains to name a Cloudflare nameserver as the authoritative nameserver for the domain).

37.     In fact, for best security, Cloudflare recommends that "[customers] configure their origin server, the host firewall, to only allow requests from Cloudflare's network."  Guinn Dep 1 at 101:4-21.

38.     There is no evidence the infringing domains at issue here maintained DNS settings that differed from those required and recommended by Cloudflare at the time they infringed on Plaintiffs' copyrights.

## Notable Benefits of Cloudflare's Performance & Optimization Services

39.     Website loading and performance speed affect how Internet users interact with a website, especially e-commerce websites looking to sell products to consumers.  Liney Dep 1 at 22:11 to 23:5.

40.     According to Cloudflare, website load speed and enhanced performance are important, make a difference in user experience, and improve user interaction, conversion rates, and website sales. "Why Does Site Speed Matter?" by Cloudflare, Exh. BB, pp. 1-2, 4; "How Website Performance Affects Conversion Rates" by Cloudflare, Exh. CC, pp. 1-4.

41.     According to Cloudflare, "[a]lmost half of online consumers will abandon a page that takes more than two seconds to load."  "Argo Smart Routing" by Cloudflare, Exh. DD, p. 3.

42.     For e-commerce websites, better performance and faster load speeds mean better user experience, increased website traffic, and higher conversion rates resulting in more online sales and revenue.  Guinn Dep 2 at 188:16 to 196:10.

43.     As such, according to Plaintiff's expert, Dr. Istvan Jonyer, Cloudflare enables online counterfeit retailers "to faster and more securely solicit consumers in the United States with infringing images. With Cloudflare's services, and the added benefits they provide (shortened load times, optimized performance, reduced latency, higher security, etc.), overseas-hosted websites can capitalize on their infringement by reaching a broader audience and realizing higher conversions (sales)."  Jonyer Report, p. 69.

## Doe Infringers' Use of Cloudflare's Services

44.     Infringing websites are known to use Cloudflare's services in order to speed up delivery of the infringing images and to present an optimized, reliable, and secure website to consumers in order to

make them believe they are purchasing the dress in the picture.  Liney Dep 2 at 172:17 to 173:10; Redford Dep 1 at 122:4 to 124:25; Ter-Saakov Dep 2 at 147:5-21.

45.     The domains identified as having infringed on Plaintiff's copyrighted works were all Cloudflare customers and receiving services under the Free or paid plans from Cloudflare at the time Plaintiff's agent Counterfeit Technology discovered the infringements and sent Cloudflare notices identifying the infringing URLs.  3rd RFA Resp., Exh. FF, No. 39; 4th RFA Supp. Resp., Exh. II, Nos. 54-55.

46.     The infringing domains at issue here used Cloudflare's caching services, and in some instances, the infringing images identified by Counterfeit Technology were served from Cloudflare's cache servers rather than from the origin host server.  Ter-Saakov Dep 4 at 479:2 to 483:19; Ter-Saakov Dep 2 at 279:11 to 282:7; XMLShop Spreadsheet Showing Cache Status of Images, Exh. GG.

**Identifying Infringements & Sending Notices to Cloudflare**

47.     In addition to Power-of-Attorney, Plaintiffs provided XMLShop with their copyrighted images for Counterfeit Technology to scour the internet to find any unauthorized e-commerce websites using Plaintiffs' images to sell counterfeit dresses.  Ter-Saakov Dep 3 (Exh. L) at 311:21 to 332:1, 336:6 to 342:15, 369:8 to 372:1.

48.     Plaintiffs also provided Counterfeit Technology with a list of authorized retailer websites for those to be excluded from Counterfeit Technology's infringement investigations.  Ter-Saakov Dep 4 at 403:21-24.

49.     Counterfeit Technology used its proprietary web crawler software to detect potentially infringing images by scanning websites and online platforms for images the technology identified as being identical to or closely resembling Plaintiffs' copyrighted works.  Through complex algorithms and machine learning designed by Suren Ter-Saakov, owner of XMLShop, the software flags images on e-commerce websites based on the material characteristics and attributes of the original copyrighted images.

11

The technology can also detect alterations of original images.  Ter-Saakov Dep 2 at 227:12 to 229:10, 231:11 to 236:24; Ter-Saakov Dep 3 at 299:14 to 306:25, 311:21 to 332:1, 345:7 to 346:1, 367:21 to 368:24.

50.     After the software identifies *potentially* infringing images, either Mr. Ter-Saakov or Armen Petrossian look at the pictures side-by-side to determine whether they are copies – and if so, Counterfeit Technology prepares and submits a notice of claimed copyright infringement to parties who can help do something about it, like the hosting provider if that information is available, or in this case Cloudflare, since online records identify Cloudflare's IP address as the hosting provider. Ter-Saakov Dep 1 at 75:7-25; Ter-Saakov Dep 2 at 153:19 to 154:9, 155:8 to 159:1; Ter-Saakov Decl., ¶ 15.

51.     Since 2016, Counterfeit Technology has identified more than 400 Cloudflare client websites it found using Plaintiffs' images without permission and submitted thousands of infringement notices to Cloudflare.  Ter-Saakov Decl., ¶¶ 6-7, 17; List of All Infringing Domains, Exhibit A to the Ter-Saakov Decl.

52.     Of the 404 infringing domains identified by Counterfeit Technology, 174 Cloudflare users (the "Repeat Infringer Domains") infringed upon Plaintiffs' images at least once after Cloudflare received notice from Counterfeit Technology about the users' infringing activities.  Ter-Saakov Decl. at ¶¶ 9-12; List of Repeat Infringer Domains, Exhibit B to the Ter-Saakov Decl,; Documentation of Repeat Infringement, Exhibit C to the Ter-Saakov Decl.

53.     Based on investigations performed prior to filing this lawsuit, Plaintiffs identified 132 of the Repeat Infringer Domains in Exhibits B and D to Plaintiffs' Amended Complaint.  FAC, Exhs. B & D; List of 132 Repeat Infringer Domains Identified in Amended Complaint, Exh. OO.

54.     It is undisputed the 174 identified Repeat Infringer Domains were Cloudflare clients and receiving (at a minimum) CDN, caching, reverse-proxy, and DNS services from Cloudflare at the time Counterfeit Technology discovered they were infringing on Plaintiffs' images and provided Cloudflare

notices of their specific infringing activity.  3rd RFA Resp., Exh. FF, No. 39; 4th RFA Supp. Resp., Exh. II, Nos. 54-56, 68 [67].

55.    In addition to receiving notices from Counterfeit Technology, Cloudflare received infringement notices from third parties about a handful of the Repeat Infringer Domains.  4th RFA Supp. Resp, Exh. II, No. 60.

56.    Despite numerous and frequent infringement complaints and take-down requests, Cloudflare did not terminate any services to the majority of the Repeat Infringer Domains or stop providing services to account holders associated with those domains, but rather continued providing CDN, caching, and DNS services despite knowledge of its clients' infringing activities.  *Id.*, Nos. 62-63, 69 [68]; 3rd RFA Resp., Exh. FF, No. 22; Documentation of Repeat Infringement, Exhibit C to the Ter-Saakov Decl.

57.    With respect to the remaining Repeat Infringer Domains, since Counterfeit Technology sent notices to Cloudflare concerning those domains, they must have been Cloudflare customers and utilizing Cloudflare's CDN, caching, and DNS services.  *See* Ter-Saakov Decl., ¶ 15.

58.    There is no evidence that at the time Counterfeit Technology discovered infringement of Plaintiffs' images and informed Cloudflare, any of the Repeat Infringer Domains were not Cloudflare customers and were not utilizing Cloudflare's CDN, DNS, and caching services.

**Cloudflare's Handling of Plaintiffs' Infringement Complaints**

59.    In response to the thousands of infringement notices Cloudflare received from Counterfeit Technology alerting Cloudflare to the rampant infringement of Plaintiffs' images by Cloudflare's website clients, Cloudflare did three things, usually automatically without any human oversight or input: █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████.  Paine Dep 1 at 51:10 to 52:24, 56:21 to 64:8.

60.     Cloudflare's automatically generated emails to customers in response to Plaintiffs' infringement complaints *did not* request any information, *did not* reiterate Cloudflare's repeat infringer policy, provide a link to the policy, or say anything about an infringement policy or potential for further investigation and service termination, *did not* caution the customer against infringement, *did not* remind customers of any relevant terms in the subscription agreements, and *did not* ask the customer to take any action whatsoever; rather, Cloudflare nonchalantly told the customers "We have forwarded this complaint to your hosting provider."  Exh. LL; Paine Dep 1 at 266:1 to 268:9; Paine Dep 2 at 72:16 to 74:17.

61.     Rather than make simple modifications to its template to *discourage*, *dissuade*, and *disincentivize* continued infringement, Cloudflare assumes all customers are intimately familiar with its terms of use and just relies on "self-serve agreement that all customers agree to when signing up for the service."  Paine Dep 1 at 266:1 to 268:9; Paine Dep 2 at 72:16 to 74:17.

62.     Even though Cloudflare recognizes "website operators may not always see or pay attention to notices sent by email", Cloudflare continues to pass along infringement complaints by email regardless of whether it is the first or millionth infringement complaint Cloudflare receives - even though Cloudflare has the ability to mail letters to paying clients or to possibly display notifications on a client's account dashboard.  Moreover, Cloudflare does not follow up or check to see if either the host or the customer do *anything* in response to any infringement complaints.  Paine Dep 2 at 90:2 to 92:9; Cloudflare Emails to ████ re Counterfeit Technology's Notices of Infringement, Exh. MM; Cloudflare Emails to █████████████ re Counterfeit Technology's Notices of Infringement, Exh. NN.

**<u>Cloudflare's Ability to Take Simple Steps to Prevent Further Infringement</u>**

63.     Cloudflare can stop providing any or all services to its customers at any time.  3rd RFA Resp., Exh. FF at No. 40.

14

64.     Account holders can create "page rules" to disable features and services on a URL-by-URL basis; which means Cloudflare can too without difficulty.  Guinn Dep 1 at 89:19 to 90:14, 108:17 to 110:19.

65.     Instead of a security challenge page, Cloudflare can put up a *blank*, *block*, or *access denied* page in response to the public's requests for specific website URLs.  Guinn Dep 1 at 111:16 to 114:25; Guinn Dep 2 at 199:6 to 200:4.

66.     In fact, Cloudflare can block access to a domain or specific URLs within a domain on a geographic basis, meaning it could block any traffic from United States, for example, from reaching a customer's whole domain or an individual webpage.  Guinn Dep 1 at 112:2-6, 116:20 to 117:16; Guinn Dep 2 at 197:25 to 198:8.

67.     Cloudflare can also easily and efficiently alter its firewall rules to block traffic from reaching a webpage or domain.  Guinn Dep 2 at 200:5 to 202:9.

68.     Cloudflare can lock customers out of their accounts.  Guinn Dep 1 at 115:1-3.

69.     Cloudflare can disable caching services as well as unilaterally purge its cache to evict cached content, including images from a customer's website – and specifically, Cloudflare can evict all cached content from a website or specific file content (.jpg, for example) with the click of a button.  Paine Dep 1 at 259:4 to 261:12; Guinn Dep 1 at 115:4-11.

70.     Since Cloudflare's services are premised on all regular Internet traffic to a client's website being filtered through Cloudflare's network, Cloudflare can temporarily block Internet traffic from reaching a customer's webpage or domain.  Paine Dep 1 at 32:9 to 35:18; Guinn Dep 1 at 106:23 to 108:19; Guinn Dep 2 at 203:11-21.

71.     Plaintiff's expert has confirmed that Cloudflare can take simple steps to limit and prevent access to infringing materials by, *inter alia*, blocking all traffic to an infringing client's web server,

15

removing an infringing user from Cloudflare's platform, and refusing to serve infringing content to the public.  Jonyer Report, Exh. EE, p. 62.

# LEGAL ARGUMENT

## I.       SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact" entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law and is determined by looking to the substantive law.  *Id*.

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial.  *Anderson*, 477 U.S. at 255.  Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007).

In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158-60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp*., 477 U.S. at 325. Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  The opposing party must show more

than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Id*. at 252

In considering a motion for summary judgment, the Court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Id*. at 255. The Court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992).

## II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR DIRECT COPYRIGHT INFRINGEMENT CLAIMS

There is no dispute the accused Doe Defendant owners of the Repeat Infringer Domains infringed on Plaintiffs' copyrights by publishing, displaying, and copying Plaintiffs' copyrighted images on their respective websites without Plaintiffs' permission. PSF, ¶ 16.

The Copyright Act gives the copyright owner the exclusive right to reproduce a copyrighted work and to distribute copies of the work. *See* 17 U.S.C. § 106(1)-(3). To establish their claim for copyright infringement, Plaintiffs need show only (1) that they own valid copyrights in the works at issue, and (2) that Doe Defendants encroached upon Plaintiffs exclusive rights as copyright holders. *See* 17 U.S.C. § 501; *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991); *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984 (9th Cir. 2017). Defendants' knowledge or intent is irrelevant to their liability for copyright infringement. *See* 17 U.S.C. § 501(a); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1166 (C.D. Cal. 2002).

Here, there is no dispute as to either of the elements needed to establish direct infringement – (1) Plaintiffs own the copyrights to the images at issue; and (2) the Repeat Infringer Domains used Plaintiffs' images without permission on their respective websites. PSF, ¶¶ 6-7, 16.

With respect to the images used by the Repeat Infringer Domains, Plaintiffs have produced their copyright registration certificates and have certified that the images were part of the collections submitted for registration. Taylor Decl., ¶¶ 3-6; Liney Decl., ¶¶ 3-6. These registration certificates are *prima facie*

17

evidence of Plaintiffs' ownership of valid copyrights, *see* 17 U.S.C. § 410(c), and therefore, the ownership element is satisfied.  *See Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998) ("copyright registration creates a presumption of ownership").

Doe Defendants are the unknown, unidentified owners of the websites found to have infringed on Plaintiffs' copyrighted images.  FAC, ¶¶ 7-8, 37, 46-49.  Plaintiffs have presented uncontroverted evidence that the Repeat Infringer Domains, which are owned and operated by Doe Defendants, have used, published, and displayed Plaintiffs' copyrighted images on their websites without permission in violation of Plaintiffs' copyrights.  Ter-Saakov Decl., ¶¶ 3-14; Documentation of Repeat Infringement, Exhibit C to the Ter-Saakov Decl.

As such, the undisputed evidence in the record establishes that the Repeat Infringer Domains have infringed Plaintiffs' exclusive rights under the Copyright Act and, therefore, Plaintiffs are entitled to judgment as a matter of law establishing direct underlying infringement of Plaintiffs' works.

## III.    PLAINTIFFS   ARE   ENTITLED   TO   SUMMARY   JUDGMENT   ON   THEIR CONTRIBUTORY INFRINGEMENT CLAIMS

As the Court recognized in denying Cloudflare's Motion to Dismiss, "one contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007); *see also Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017) ("[A] computer system operator is liable under a material contribution theory of infringement if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." (internal quotations and italics omitted)).

Thus, under Ninth Circuit precedent, an internet service provider is contributorily liable for copyright infringement under the material contribution theory if it: (1) has actual knowledge of specific infringing activity, (2) is able, but fails to take simple measures to stop that infringement, and (3)

continues to provide services to known infringers.  *See Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007).

### A.     Cloudflare Had Actual Knowledge of Specific Infringing Activity

In the online services context, evidence of actual knowledge of specific acts of infringement is required to hold a computer system operator liable for contributory copyright infringement.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021-22 (9th Cir. 2001).

Actual knowledge exists where it can be shown by a defendant's conduct or statements that it knew of specific instances of direct infringement. *Id*. at 1020.  Constructive knowledge exists where it can be shown a defendant should have known of the direct infringement.  *Id*.  Generally, "the copyright holder must provide the necessary documentation to show there is likely infringement."  *Id*. at 1021 (quoting *Religious Tech. Ctr. v. Netcom On-Line Comm. Servs., Inc*., 907 F. Supp. 1361, 1374 (N.D. Cal. 1995)). "[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Id*. (citing *Netcom*, 907 F. Supp. at 1374).

A proper takedown notice under the DMCA would confer actual knowledge of the specific infringement identified in the notice.  *See Luvdarts, Ltd. Liab. Co. v. AT&T Mobility, Ltd. Liab. Co*., 710 F.3d 1068, 1072-73 (9th Cir. 2013).  In order to comply with the DMCA (and therefore confer actual knowledge on the recipient), a takedown notice must identify "the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." 17 U.S.C. §512(c)(3)(A)(iii) (emphasis added). "The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously." *Viacom Int'l, Inc. v. YouTube, Inc*., 940 F.Supp.2d 110, 115 (S.D.N.Y. 2013) (internal citations omitted).

Here, Plaintiffs sent Cloudflare very specific infringement notices identifying the name of the

19

infringing domain clients, the specific URL where the infringing image could be located, the name of the copyright owner, and a link to the copyrighted image being infringed.   Ter-Saakov Decl., ¶¶ 5-6; Infringement Notices, Exhibit E to the Ter-Saakov Decl.  At that point, Cloudflare had all the information it needed to locate the infringing material and take simple action such as evicting the infringing content from its cache servers and blocking access to the infringing content.  PSF, ¶¶ 65-71.

Since the infringement notices received by Cloudflare contained detailed information about specific infringement activities and content traveling through and from Cloudflare's CDN network, Plaintiffs have established, as a matter of law, that Cloudflare had actual knowledge of specific acts of infringement.  *See* Infringement Notices, Exhibit E to the Ter-Saakov Decl.; *see also Miller v. Facebook, Inc.*, No. C 10-00264 WHA, 2010 U.S. Dist. LEXIS 31534, *21-22 (N.D. Cal. Mar. 31, 2010) (finding plaintiff's single letter to Facebook identifying and demanding it remove infringing material established actual knowledge element).

### B. After Learning of Specific Infringements, Cloudflare Failed to Take Simple Measures to Prevent Further Infringement of Plaintiffs' Works

A computer system operator can be held contributorily liable if it "has actual knowledge that specific infringing material is available using its system," *Napster*, 239 F.3d at 1022, and can "take simple measures to prevent further damage" to copyrighted works, *Netcom*, 907 F. Supp. at 1375, yet continues to provide access to infringing works, *Amazon*, 508 F.3d at 1172.  Disabling IP addresses, purging infringing content from servers, and terminating internet services to infringers have all been found to constitute "simple measures."  *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., In*c., 591 F. Supp. 2d 1098, 1109 (N.D. Cal. 2008); *Napster, Inc*., 239 F.3d 1004; *Umg Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019).

Here, Cloudflare could have taken numerous simple and easy steps to prevent further infringement of Plaintiffs' works.  Cloudflare could have: (1) purged its cache servers of the infringing content; (2) disabled caching services to an infringing domain or infringing URL; (3) blocked public access to the

infringing content; and/or (4) ceased providing website optimization services to an infringing domain. PSF, ¶¶ 63-71.  Cloudflare has the tools, capabilities, faculties, knowledge, and resources to implement one or more of those simple preventative steps yet chose not to after receiving notice of specific infringement by its customers.  *Id*.; PSF, ¶¶ 59-62.

And while a customer could very well move away from Cloudflare's platform and continue its infringing activities – the focus is not on what customers or third-parties do, but on what Cloudflare can do to prevent and discourage infringers from using its systems and tools to exploit and infringe on Plaintiffs' copyrights.  *See Luvdarts*, 710 F.3d at 1071 ("[I]n general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement.").  Unfortunately, with respect to the notices and works at issue here, Cloudflare did not take any of the available easy steps to prevent further infringement using Cloudflare's services, but rather only passed along the complaint information without taking any ameliorative or preventative action.  PSF, ¶¶ 59-71.

As such, Plaintiffs are entitled to judgment as a matter of law that in response to specific infringement notices concerning the Repeat Infringer Domain clients, Cloudflare failed to take reasonable and feasible steps to prevent further damage to Plaintiffs' works by restricting access to the infringing materials and/or websites.

> ### C.  The Repeat Infringer Domains Continued to Use Cloudflare's Services to Infringe on Plaintiffs' Copyrights After Cloudflare Received Notice of Its Customers' Infringing Activities

It is undisputed that Cloudflare continued to provide CDN, caching, security, reverse-proxy, DNS, and web optimization services to domain clients even after being informed of their infringing activities. PSF, ¶¶ 45, 51-58; Ter-Saakov Decl. at ¶¶ 9-12, 15; Documentation of Repeat Infringement, Exhibit C to the Ter-Saakov Decl.  According to Plaintiffs' uncontroverted proofs, repeat infringer clients continued using Cloudflare's services to cache and speed up delivery of infringing content even after Cloudflare was initially informed about its clients' infringing behavior.  *Id*.

By continuing to cache infringing images and transmit infringing content through its network at the request of the browsing public, Cloudflare continued to provide access to the infringing works. PSF, ¶¶ 17-38, 44-46; *see also Amazon*, 508 F.3d at 1172 ("services or products that facilitate access to websites throughout the world can significantly magnify the effects of otherwise immaterial infringing activities"). Therefore, Plaintiffs are entitled to judgment as a matter of law that Cloudflare continued to provide access to Plaintiffs' infringing works after receiving notice of its clients' infringement activities.

### D.      Cloudflare Materially Contributed to Infringement

According to the Ninth Circuit, a service provider materially contributes to infringement where it "has actual knowledge that specific infringing material is available using its system," and can "take simple measures to prevent further damage" to copyrighted works, yet continues to provide access to infringing works. *Amazon*, 508 F.3d at 1172. As discussed in Subsections A-C above, all three prongs are satisfied here.

Like Napster, Cloudflare materially contributes to its clients' infringement by supplying the proprietary technology, tools, servers, and means of establishing a connection between the web browsing public and the infringing content on its clients' websites, and despite the ability to restrict access to infringing material after being notified of specific infringement does not do so and instead continues serving infringing images from its cache servers and delivering infringing material to the public in a fast, reliable, and secure way. PSF, ¶¶ 17-71; *see also Napster*, 239 F.3d at 1022 (by supplying the proprietary software, search engine, servers, and means of establishing a connection between users' computers by which users' shared and downloaded infringing material, Napster materially contributed to copyright infringement); *Netcom*, 907 F. Supp. at 1373-74 (if found to have the requisite knowledge of specific infringements, Netcom, an "access provider" that stored and transmitted allegedly infringing newsgroup posts, would be liable "for contributory infringement since its failure to simply cancel [the end user's] infringing message and thereby stop an infringing copy from being distributed worldwide constitutes

22

substantial participation in [the end user's] public distribution of the [infringing] message").

Additionally, the Ninth Circuit has found that a third party materially contributes to infringement by providing physical space to known infringers, or, in the online context, by providing server space to known infringers. *See Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[W]e agree with the Third Circuit's analysis…that providing the site and facilities for known infringing activity is sufficient to establish contributory liability."); *see also Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("Material contribution turns on whether the activity in question 'substantially assists' direct infringement…. There is no question that providing direct infringers with server space satisfies that standard.").

There is no dispute Cloudflare provided server space by and through its caching services to its infringing domain clients where infringing images were temporarily stored and delivered to the consuming public.  PSF, ¶¶ 19-30, 44-46.  As such, Plaintiffs are entitled to summary judgment finding Cloudflare liable for contributory copyright infringement of Plaintiffs' works.  The only remaining issue is the determination of statutory damages.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Summary Judgment must be granted.

Respectfully submitted,

By: /s/ *Gene Markin*
    GENE MARKIN, ESQ.
    **STARK & STARK, P.C.**
    993 Lenox Drive
    Lawrenceville, NJ 08648
    (609) 895-7248
    *Attorneys for Plaintiffs*

23